AUGUST J. HOERRNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DENNIS R. O'BRIEN AND JULIA O'BRIEN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hoerrner v. Commissioner
Docket Nos. 13923-82, 14682-82, 24246-83.
United States Tax Court
T.C. Memo 1985-347; 1985 Tax Ct. Memo LEXIS 293; 50 T.C.M. (CCH) 417; T.C.M. (RIA) 85347; July 15, 1985. Jerome Kamerman and Steven Kamerman, for the petitioner. Victoria Wilson,Jody Tancer and Alan H. Kaufman, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in the amount of $20,436.72 in petitioner August Hoerrner's ("Hoerrner") 1978 Federl income taxes. Respondent determined deficiencies in the amount of $10,529.50 and $8,005.00, respectively, in petitioners Dennis and Julia O'Brien's [1] ("O'Brien") joint 1978 and 1979 Federal income taxes. *295 The tax liabilities in dispute in these consolidated cases arise from each of the petitioners' involvement in the Tri-Rotor Motor Co. ("Tri-Rotor") limited partnership. Tri-Rotor acquired engine patents and reported losses that were passed through to petitioners as limited partners. The correctness of respondent's disallowance of these deductions, [2] which produced the determined deficiencies, turns on the following issues: 1. Whether nonrecourse notes given by the partnership as part of the consideration for the patents and their development were genuine indebtedness; the answer determines the allowability of interest deductions claimed by Tri-Rotor and included in the loss deductions passed through to the partners in 1978 and 1979; and, 2. Whether the partnership's activities with respect to the patents constituted a trade or business; the answer determines whether petitioners are entitled to deductions for losses attributable to deductions for business expenses and depreciation claimed under sections 162(a), [3]167(a) and 174(a) that were passed through Tri-Rotor to them; [4]
*296 FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly. The stipulations of fact and attached exhibits are incorporated herein by this reference. Petitioner Hoerrner resided in Westhampton, New York, when he filed his petition in these consolidated cases. Petitioners O'Brien resided in Bethpage, New York, when they filed their petitions in these consolidated cases. Formation of Tri-Rotor
Phoenix Associates XVI was formed under the limited partnership laws of the State of Connecticut in June 1975. In 1976, the partnership's name was changed to Tri-Rotor. Vanguard Ventures Inc. ("Vanguard"), formerly named Tax Management Corp., and Phoenix Resources, Inc. ("Phoenix"), were the general partners of Tri-Rotor. The original limited partner of Tri-Rotor was Carl Paffendorf ("Paffendorf"). He was replaced by Craig Shields, an attorney with the law firm of Sage, Gray, Todd & Sims ("Sage, Gray") Vanguard was the managing partner of Tri-Rotor. The amended partnership agreement provided that Vanguard, as the managing general partner, would have control and responsibility for the "business, affairs and operations" of Tri-Rotor. The partnership *297 agreement provided that Vanguard should be paid $100,000 on December 31, 1976, for work performed in that month, $100,000 in 1977, and $50,000 plus one percent of gross sales for each year thereafter. Tri-Rotor had four offerings of limited partnership interests dated December 24, 1976, February 10, 1977, November 18, 1977, and December 19, 1980. In the 1976 offering, limited partnership interests were offered in units of $2,000 each. There were thirty-two subscribers. In the 1977 offerings, the interests were offered in units of $38,000 each. There were thirty-four subscribers, of which twenty-two were prior subscribers to the 1976 offering. In the 1980 offering, interests were offered in units of $29,000 each. Tri-Rotor received the following capital contributions from the subscribers to these offerings: Date
Amount
1976
$70,000
1977
1,330,000
1980
686,500
Total
$2,086,500
Hoerrner purchased one limited partner unit in 1977. His payment for the unit consisted of $20,000 cash, a $10,000 note due in 1978 and an $8,000 note due in 1979. O'Brien became a limited partner in 1976 by paying $1,000 in cash for a one-half unit. In 1977 and in 1980 he *298 also purchased one-half units. A confidential memorandum was issued in conjunction with each offering. These memoranda stated that there was a high degree of risk in purchasing a unit in Tri-Rotor due to the developmental state of the tri-rotor engine, uncertainties of the market, competition, and lack of financing. The memoranda noted that because of the interrelationships between all the entities involved with Tri-Rotor, there was a lack of arm's length dealing. The memoranda stated that the limited partners may expect to derive substantial benefits from partnership tax deductions. Attached to each memorandum was a detailed projection by Laventhol and Horwath, accountants, illustrating the after-tax cash benefits and the projected taxable loss. The memoranda warned of the tax risks and the possibility of a challenge by respondent concerning the includibility of nonrecourse obligations in the limited partners' adjusted bases, and the possibility that some fees and expenses taken as deductions would be disallowed or required to be capitalized. Attached to each memorandum was a tax opinion letter, several of which were prepared by Sage, Gray. These letters discussed the tax *299 consequences to the investors of the use of nonrecourse notes under both the patent purchase agreement and the research and development agreement, the Tax Reform Act of 1976, and other tax consequences. COAP Systems Inc. and Vanguard Ventures
COAP Systems, Inc. ("COAP") is a publicly held New York corporation. Paffendorf has been president, chairman of the board, chief executive officer and a controlling shareholder of COAP since he founded the company. In 1976, 1977, and 1978, COAP had three wholly owned subsidiaries: COAP Planning, Inc., Digitax, Inc., and Hi-Tech Research, Inc. ("Hi-Tech"). Digitax, Inc. was engaged in the development, sale and maintenance of computerized income tax return programs. COAP Planning, Inc. was engaged in computerized estate planning programs. Hi-Tech was formed in November 1976. For the fiscal years ending March 31, 1977 through March 31, 1980, the Forms 10-K filed by COAP with the SEC state that Hi-Tech derived all of its income from the sale of services to limited partnerships of which Vanguard was a general partner. The Forms 10-K also state that Hi-Tech was an insignificant factor in the research and development of new products and *300 had numerous competitors. Paffendorf was the majority shareholder, an officer and chairman of the board of directors of Vanguard. Vanguard owned shares in COAP. Greenhouse Management Corp. ("Greenhouse") was a subsidiary of Vanguard. Soloman Manber ("Manber") was the chairman of Greenhouse. He was also a shareholder and director of Vanguard. At one time he was a shareholder and director of COAP. Phoenix was an 80 percent to 100 percent owned subsidiary of Vanguard from 1976 through 1979. In 1979 it became a 100 percent wholly-owned subsidiary. The selling agent for Tri-Rotor's first three limited partnerships offerings was Pico Alexander Capital Corporation ("Pico"), a subsidiary of Vanguard at the time of the offerings. From 1977 through the years at issue, Vanguard and/or Phoenix was the general partner in ten limited partnerships. These included the Penverter, Reportco and Realco partnerships. Vanguard and its subsidiaries maintained at their office the books and records for all of the limited partnership in which they were general partners. The books and records of Tri-Rotor were maintained at this office and Tri-Rotor had no separate office. Prior to the tri-rotor *301 engine, Vanguard had never purchased or otherwise invested in the development of any type of internal combustion engine. Vanguard was in the "tax shelter" business. The Patents and the Assignment Agreement
William Casey ("Casey") was a shareholder in both COAP and Vanguard and he had been a friend and associate of Paffendorf's since the early 1960's. In 1978, he purchased COAP Planning, Inc. from COAP. Either Casey or his wife were limited partners in the Penverter and Realco partnerships. Casey is a lawyer. He, together with J. K. Lasser, authored one of the early texts on tax shelter investments. Casey also was active in promoting and investing in various business projects. According to Casey, Paffendorf was putting together tax shelters involving research and development partnerships. George Doundoulakis ("Doundoulakis") was the inventor of the tri-rotor engine. Doundoulakis had no previous experience with internal combustion engines. His background was in microwaves, antennas and computers. His own research and development company went bankrupt. Casey became friends with Doundoulakis in the 1960's and employed him for about a year in 1970. Casey introduced Doundoulakis *302 to Paffendorf in 1966. Casey provided Doundoulakis with $10,400 to help with development of the tri-rotor engine. The tri-rotor engine was neither equivalent to nor comparable with the Wankel rotary engine. Two patents were issued to Doundoulakis for two and three rotor engines on October 12, 1976 and November 2, 1976, respectively. Doundoulakis assigned Casey a thirty percent interest in these patents and assigned a fifteen percent interest to his brother Helias Doundoulakis. ("Helias") The engine project was "an informal joint venture", and Doundoulakis, his brother and Casey were not in a partnership.However, as the owners of the two patents, they were called the DCD Group. Casey attempted to interest Chrysler, Curtiss-Wright, General Motors and the Energy Research and Development Administration ("ERDA"), in the engine. None of these organizations were interested in investing their funds and time in developing the engine. In a letter dated October 1976, ERDA informed Casey that: The concept * * * appears to be considerably more complex than a conventional Wankel engine. Additional seals produce increased leakage and friction, which do not contribute to lower fuel consumption. *303 * * * Mr. Doundoulakis' claim that changing the velocity/geometry constraints will lower emissions is not supported by experience. * * * Lower fuel consumption does not necessarily result in lower emissions. * * * It is also doubtful that high reliability can be achieved in the complex mechanism and gearing. Doundoulakis also submitted the tri-rotor engine to the Office of Energy-Related Inventions ("OERI"). In February of 1976, the OERI informed Doundoulakis that for selection: [D]esigns must be technically sound without question, represent an advance in the state of the art, and be clearly superior in terms of practicality and realizable energy savings. Unfortunately, your designs do not meet these requirements. We feel particularly that there would be severe developmental problems associated with compression adequacy and sealing. After being rejected by all the organizations written to, the DCD Group sold the patents to Tri-Rotor. According to Doundoulakis, he and Casey negotiated the sale with Paffendorf and he asked for $10 million. According to Paffendorf, he and Casey negotiated the sale, he did not recall Doundoulakis being present, and Casey set the price on *304 the patents at $5 million. According to Casey, he negotiated the sale on behalf of the patent holders and he did not know how they arrived at the $5 million figure. In 1976, the patents had no commercial value. The DCD Group and Paffendorf entered into a patent assignment agreement that provided for the sale of the patents to Tri-Rotor for $50,000 in cash and a $4,950,000 nonrecourse note. Although the agreement was signed on December 26, 1976, the agreement states that it was "made as of the 1st day of December 1976." A major concern in signing a contract prior to December 31, 1976, was the change in the tax laws limiting losses in partnerships using nonrecourse financing. The original nonrecourse note cannot be located and was not produced at trial. Casey was appointed Director of the Central Intelligence Agency in 1981. Neither the patents nor the note were reported in his original financial disclosure statement. On a subsequent financial disclosure filing, Casey reported an "interest in a patent" valued at $10,400. Casey considered the patent sale to be "contingent" and the value of the notes "speculative." The patent assignments provided for minimum royalties of $500,000 *305 per year, beginning in 1987. The agreement stated that a right of reversion to the DCD Group arose if the partnership failed to pay any installment of principal, interest or royalties within thirty days of the due date. The right of reversion also applied if Tri-Rotor did not "meet the obligation of a research and development contract with Hi-Tech to spend $3,000,000 in cash and notes over four years to develop the patent and build operating and production models of the tri-rotor engine." The agreement further provided that Tri-Rotor was entitled to the assignment of any improvements on the patents made by any member of the DCD Group. The nonrecourse note provided for principal payments of $50,000 per year for the years 1977 through 1979, and larger payments thereafter. The note stated that interest was payable annually on December 31 of each year, commencing in 1976. The note further states that upon default by Tri-Rotor, the DCD group can, in no event, proceed against Tri-Rotor's assets or its general or limited partners' assets. Doundoulakis received no interest payment on December 31, 1976, and he believed that the payment was made to COAP. In a letter dated May of 1977, *306 the DCD Group agreed to allow Tri-Rotor to add the $297,000 of interest due in 1977 to the final installment of the note in exchange for the payment of an additional $50,000 on the principal of the note. A letter dated December of 1979 provided for deferral of a December 15, 1980 payment of $150,000 due to the DCD Group until January 15, 1981. The $50,000 was never paid. In a letter dated October 29, 1980, it was agreed that there would be a "moratorium" on all principal and interest payments due on the note, except for $25,000 annually, until the later of December 1985 or December of the third year after the completion of a "working engine." This agreement further provided that upon the closing of the 1980 Tri-Rotor offering there would be a $50,000 payment of interest for 1979 and 1980. The letter stated that "time is of the essence since our present financing proposal is keyed to 1980 deductions." Doundoulakis signed a letter dated April of 1981, which stated that he agreed as the general partner and majority owner of the DCD Group partnership to waive the $25,000 interest payment due in 1980. The records of Tri-Rotor show a payment of $50,000 in 1980. The records of Tri-Rotor *307 show the following payments made to the DCD Group or its individual members in the years 1976 through 1979: Date
Amount
To
December 31, 1976
$50,000
DCD
December 21, 1977
55,000
Doundoulakis
December 21, 1977
15,000
Helias
March 17, 1978
30,000
Casey
December 22, 1978
500
Doundoulakis
December 22, 1978
27,000
Doundoulakis
January 11, 1979
7,500
Helias
January 11, 1979
15,000
Casey
Total
$200,000
Casey received a total of $60,000, all of which was paid prior to 1980. He did not know if Tri-Rotor had spent $3 million in the four year period mandated by the agreement. Research and Development Agreement
Tri-Rotor entered into a research and development ("R & D") agreement with Hi-Tech, which was dated "as of December 31, 1976." The R & D agreement was still unsigned as of February 11, 1977. The agreement clearly was not an arm's-length transaction. Paffendorf confirmed that "it was not an adversary type of negotiation." The R & D agreement provided for a three phase development of an engine from the patents purchased by Tri-Rotor from the DCD Group. Phase I required the development, by November 30, 1977, of a laboratory prototype *308 designed to verify and improve upon the concepts described in the patents. Phase II required the development by November 30, 1978, of a field test prototype designed to test the engine in actual application. Phase III required the development, by November 30, 1979, of a production model prototype, for production tooling. The R & D agreement provided for the following payments to Hi-Tech. Phase:
Phase I
Phase II
Phase III
Totals
Cash:
$150,000
$75,000
$50,000
$275,000
Nonrecourse
Notes:
1,350,000
675,000
450,000
2,475,000
Phase Total
$1,500,000
$750,000
$500,000
$2,750,000
Payment for Phase II and III was dependent upon successful completion of the previous phases. Independent written verification of the substantial completion of the three phases was required. The agreement provided that the prototypes, inventions, improvements, know-how and discoveries resulting from the project would be assigned to Tri-Rotor. The R & D agreement represented that Hi-Tech had the requisite facilities and experience for scientific research and development of combustion engines and the building of prototypes. Research and Development Activity
*309 Doundoulakis has been the president of Hi-Tech since 1976. He and Peter Dominguez ("Dominguez") became responsible for the engine development. Dominguez has been an officer and shareholder of COAP since the early 1960's and he also owned shares of Vanguard. Doundoulakis and Dominguez became limited partners in Tri-Rotor in 1980. Doundoulakis and Dominguez did not work on the engine on a full time basis. They also were employed to do research and development for the Penverter, Reportco and Realco partnerships. Neither Doundoulakis nor Dominguez had (1) any previous experience in the development of internal combustion engines; (2) a membership in an automotive engineering society; or (3) published any papers in professional journals on automotive engines. Doundoulakis prepared a computer simulation program for the engine. He had no prior experience in automotive engine computer simulations. The claims for the engine's performance were based on the computer simulation. The simulation contained many errors in formulae, facts and assumptions. Based on the simulation, Doundoulakis asserted that the engine would be superior to conventional engines because of higher compression *310 ratios, lower friction and emissions, thermal efficiency, light weight and high power output. At the time of trial the development of the engine was still in Phase I. Manber signed prepared reports in December of 1977 and 1978, verifying as an "independent" inspector that Phase I and Phase II had been substantially completed. Manber was also the inspector for the Reportco and Penverter proejects. The two Tri-Rotor inspection reports and the Reportco inspection report contain virtually identical language. Manber did not know who drafted the inspection reports. Manber was not an expert and had no background in the development of internal combustion engines. Manber did not specifically recall any one other than Doundoulakis and Dominguez working at Hi-Tech, stating that "there were not very many people in the company that I was aware of." Besides the inexperience of Doundoulakis and Dominguez, the engine development suffered from a variety of practical and technical problems. At the time the R & D agreement was drawn up, Hi-Tech had no development facilities. Once Hi-Tech acquired space for the engine work, development was delayed by lack of equipment such as a computer system *311 and a test chamber. A rachet-pavel arrangement had to be eliminated because of its unreliability. Further problems were caused when the engine had higher moments of inertia and greater sealing difficulties than predicted by Doundoulakis and his computer simulation. Doundoulakis also determined that portions of the engine would have to be made of relatively expensive titanium. Hi-Tech did produce an engine capable of firing. No data was obtained from this engine to support the various claims of superior performance and efficiency made by Doundoulakis. When in operation the engine was extremely noisy, and at the time of trial it did not function at all. Several additional patents were obtained by Doundoulakis. These patents were never assigned to Tri-Rotor. The R & D agreement was modified to such an extent that from 1978 onward Hi-Tech's only obligation was to do its best to finish the engine. No formal budgets were required by Tri-Rotor, and no written budgets were prepared by Hi-Tech. According to Doundoulakis: The budget was how much do you think you need for the next year. Carl [Paffendorf] would ask me, I would say about a hundred and twenty thousand dollars. And *312 he says, okay go ahead. The agreements modifying the R & D agreement were signed by Robert Blau ("Blau") in 1978 and 1979. Blau was the vice president of Vanguard and he signed the agreements on behalf of Vanguard as the general partner in Tri-Rotor. The agreements were arranged by Doundoulakis and Paffendorf. One letter dated June 28, 1978 stated that "it has become apparent that an actual application as anticipated in Phase II * * * will not be practical." Blau also signed a letter to Tri-Rotor from Hi-Tech agreeing to defer payments on the nonrecourse notes. Blau was the vice president of finance of COAP. In a letter dated July of 1978, Blau, on behalf of Tri-Rotor, confirmed an agreement whereby Hi-Tech and COAP were to perform a market study for Tri-Rotor and whereby COAP (later changed to Hi-Tech in 1979) was to assume the administrative responsibilities for Tri-Rotor. Blau could not recall what administrative responsibilities Hi-Tech took over for Tri-Rotor. The marketing report was postponed in November of 1978 until "after the project has been more fully developed." The records of Tri-Rotor indicate that $50,000 was paid to COAP in 1978 for the study. No report was *313 completed prior to 1984. In 1984, a report was produced by Doundoulakis and Dominguez, neither of whom are marketing experts. Doundoulakis could not state how much Hi-Tech spent on the development of the engine. Paffendorf "promised" Doundoulakis that Hi-Tech, COAP and Vanguard would finance any cash shortfall resulting from the use of the nonrecourse notes. Hi-Tech produced no records of any such financial aid. Instead, Hi-Tech's records show that for the years 1977 through 1982, Hi-Tech was owed a large amount by COAP and its subsidiaries. Hi-Tech did not report as income the nonrecourse notes received from Tri-Rotor. At the time of trial, Hi-Tech could not locate and failed to produce the original nonrecourse notes. The Forms 10-K filed by COAP show that Hi-Tech spent the following amounts on all research and development projects: Fiscal Year
Amount
1978
$91,000
1979
90,000
1980
149,000
1981
84,000
Total
$414,000
Respondent introduced credible evidence showing that Hi-Tech's books and records indicate total expenses for all projects for the fiscal years ended March 31, 1977 through March 31, 1982, of $1,953,639, and total expenses allocated to *314 the Tri-Rotor project of approximately $640,957. According to Paffendorf, Hi-Tech spent $3-4 million on the engine development. Books and Records of Tri-Rotor
Tri-Rotor reported the following losses on its Forms 1065 Partnership Returns: Year
Loss
1976
$ 166,375
1977
2,144,332
1978
1,575,905
1979
1,214,219
1980
564,598
Total
$5,665,429
The only income reported by Tri-Rotor in these years was interest income, which was paid to the partnership by the limited partners. Tri-Rotor claimed the deductions shown in the first column below for R & D expense for the years 1976 through 1980. Tri-Rotor's books and financial statements reflect payments to Hi-Tech shown in the second and third columns below: Nonrecourse
Deductions
Cash Pmt.
Note Pmt.
1976
$ 25,000
1977
1,475,000
150,000
1,350,000
1978
750,000
422,000
400,000
1979
425,000
5,000
350,000
1980
200,000
200,000
Total
$2,875,000
$577,000
$2,300,000
A January 17, 1981 letter called for payment to Hi-Tech in 1981 of $162,500, payable $50,000 in cash in March of 1981, and $112,500 with a nonrecourse note. Hi-Tech was not paid the $50,000 in *315 March of 1981. Tri-Rotor's records and financial statements show that $81,000 and $105,000 of interest was paid to Hi-Tech in 1978 and 1979, respectively. Although on the accrual method of accounting, in 1980 and 1981, Tri-Rotor did not accrue interest expenses to Hi-Tech on its books and financial statements, and the partnership made no interest payments to Hi-Tech for interest accrued in those years. The audit statements prepared by Tri-Rotor's accountants noted that there was no fire or casualty insurance on the engine model. Paffendorf, as president of Vanguard, sent several letters to the limited partners of Tri-Rotor in 1980. In a letter dated June 13, 1980, Paffendorf stated that participation in the 1980 Tri-Rotor offering would generate two to one tax write-offs and that "most partners will have very little capital at risk after tax recovery." In a letter dated November of 1980, Paffendorf stated that participation in the 1980 Tri-Rotor offering would "generate tax deductions at ratio of more than 3 to 1." Certain letters to the Tri-Rotor limited partners in 1980, 1981 and 1982, invited the limited partners to participate in "several attractive, tax-advantaged investment *316 opportunities." Evaluation of the Engine
Paffendorf hired Technical Audit Associates ("TAA") to value the engine in 1977. TAA also did reports on the Reportco and Penverter projects. Frank Jewett ("Jewett") was the president of TAA. He first heard of Tri-Rotor's project from an attorney at Sage, Gray. Jewett became a member of the advisory board of Greenhouse. Jewett had no expertise in the area of internal combustion engines. A TAA memorandum stated that "[t]his assignment will be different from any other that TAA has undertaken." Herman Sheets ("Sheets") and Lewis Conta ("Conta") participated with Jewett in the assessment of the engine for TAA. Sheets had no experience in internal combustion engines and was not an expert on their development. In making his analysis, Conta relied on his judgment of the characteristics of the engine. His understanding of the engine's claimed characteristics came from a description provided by Doundoulakis, which was based on the computer simulation. However, Conta did not have "too much confidence" in the computer simulation. In preparing its valuation report, TAA assumed: (1) that the claims for engine performance were true; (2) *317 that the financing of the engine would provide adequate facilities, personnel and support as was appropriate in the automotive and related engine industries; (3) that the people developing the engine were "effectively organized" with "the high level of management, technical and promotional skills that are essential for success"; (4) that the "many sophisticated technical problems that must be solved" would be "recognized and appropriately addressed * * * in a timely fashion"; and (5) that it would take 10 years to develop a working model of the engine for licensing or patent sale purposes. TAA placed a value of $11,000,000 on the patents in the 1977 report. TAA stated in the 1977 report that the engine should reach efficiency levels of close to 50 percent in the early 1980's. In making this assessment, the TAA review panel disregarded the engine's rejection by the outside agencies and companies. TAA asserted that Tri-Rotor held a strong patent position. TAA did not perform a patent search and was not given any patents having to do with the engine described to them. Prior to writing its 1977 report, TAA asked an attorney at Sage, Gray what standards respondent used to test values *318 and what categories of examination respondent would expect to find in an independent valuation. TAA prepared a report on the engine's development in 1980. This report enumerated many problems, including: (1) marginal and unsafe test facilities; (2) no clearly established phases or decision making at predetermined levels; and (3) a lack of clearly established objectives. The 1980 report cited many technical problems with the engine and asserted that the computer simulation "does not warrant the confidence placed in it by Hi-Tech." The report stated that the program is behind the original schedule and that: The current organization structure is handicapped in developing an operable engine due to lack of manpower, facilities and specialized expertise, and is, in our opinion, largely responsible for the substantial delay in time which this program cannot afford. The 1980 report noted that there was no test data to substantiate the projected engine efficiencies. The 1980 report recommended many changes, including "either to turn the program over to an organization experienced in internal combustion engine developments, or to have it overseen by such a group." The report stated *319 that program objectives should be clearly established and: Once the objective is clearly established, a development plan, schedule and budgets should be defined in writing and adhered to. Regular bimonthly progress letters should indicate how the progress of the engine development meets the plan. Tri-Rotor and Hi-Tech did not follow the recommendations of the 1980 TAA report. In 1979, Paffendorf first approached Battelle Laboratories ("Battelle") to technically evaluate the engine. Battelle actually began work on the report in April of 1981. The report was prepared in 1982. The Battelle report noted many technical problems with the engine. [5] The report criticized the computer simulation and the claims made for engine performance. The report made recommendations, which included placing limits on how much more in time and funds should be devoted to developing the engine, increased safety precautions, and changes in the computer program. Doundoulakis and Hi-Tech did not implement these recommendations. At trial, John Herridge, an employee of Battelle, refused to testify as an expert witness, stating "the policy of the organization for which I work is that we do not serve *320 as expert witnesses." John Heywood ("Heywood"), respondent's expert witness, is a professor of mechanical engineering and director of the Sloan Automotive Laboratory at MIT. He testified and submitted reports on the engine and its development. Heywood is an outstanding expert in the field of internal combustion engines and emissions. Heywood was a credible, convincing and persuasive witnesss. Heywood stated that the critical claim made by Doundoulakis, that the engine could operate at a compression ratio at least twice as high as conventional engines, was incorrect and unsubstantiated. He also found that: (11) the operation of the engine would be limited by knock; (2) Doundoulakis' claim that friction would be substantially less than in conventional engines was arbitrary and technically unjustified; and, (3) the complexity of the piston catching mechanism raised doubt concerning the reliability and durability of the engine. Heywood discerned a large number of errors in the computer simulation. He stated that the "predictions of vehicle fuel economy and *321 emissions * * * have no validity and would not be convincing to anyone knowledgeable about engine performance." Further, he discovered that the critical erroneous assumptions made in the computer program in 1976 had not been significantly changes by 1984. Heywood summarized his opinion of the engine as follows: In summary, the two basic concepts proposed individually and in combination in this set of inventions are: an oscillating piston rotary mechanism, and a ballistic engine. While the details of the mechanisms proposed may be novel, and the combination may be novel, these two concepts have a long history of invention, exploration and development. Thus, the disadvantages of these concepts, their specific problems, and their inferior characteristics relative to conventional engines are well established. Most of these difficulties are inherent in the concepts. They can not be overcome by changing the details of the mechanisms by which they are realized in practice. In the absence of convincing technical evidence that these disadvantages, problems and inferior characteristics have been overcome, inventions and patents in these areas have no significant market value. Only *322 if technically sound quantitative information which showed that the established problems had been overcome were available would these ideas be worth pursuing further. Such information does not exist in the patents and report reviewed here. The computer simulation used to examine the performance characteristics of the tri-rotor ballistic engine, and compare its performance to that of an equivalent reciprocating engine, is incomplete, and contains errors and arbitrary assumptions. Its predictions are not, therefore, a valid indication of the invention's potential performance. In conclusion, it is my judgment that the concepts described in these patents have no commercial value. No technically valid evidence is presented to show that the generic problems of oscillating piston engines an free piston engines (here combined into one concept), which are well known, have been overcome. There is, therefore, no convincing evidence that any potential market for the two and tri-rotor ballistic and nonballistic engines exists. I would not advise anyone to invest in these patents, nor in the development of these engine concepts, if they expected to obtain any return on their investment. *323 Heywood reviewed the development of the engine. He found that there was a "total lack of realism" in the "ridiculously short" time scales and levels of effort outlined by the R & D agreements. He noted that, under optimal conditions, with well known technology and adequate resources, it "takes the automotive industry about five years to take a new conventional engine concept from initial definition of objectives to production stage." These time scales were well known when the R & D agreement was drafted. Heywood visited the engine at Hi-Tech's facility. He stated that the engine "was incredibly noisy; I have never heard as noisy an engine under equivalent conditions in all my many years of professional experience in this field." Heywood noted that the status of development was not commensurate with the level of effort claimed by Hi-Tech and Doundoulakis. OPINION A. Interest Expenses
1. Patent Acquisition
Section 163(a) provides for the allowance of a deduction for "all interest paid or accrued within the taxable year on indebtedness." It is well settled, however, that, *324 for the deduction to be allowable, the indebtedness must be genuine. Because nonrecourse loans offer obvious opportunities for trifling with reality, the cases are legion applying that principle to transactions that lack substance. Thus, in Hager v. Commissioner,76 T.C. 759, 773-774 (1981), we stated: It is settled that amounts paid as interest must be paid on genuine indebtedness to be deductible under section 163(a) ( Knetsch v. United States,364 U.S. 361 (1960); Narver v. Commissioner,75 T.C. 53, 98 (1980); [affd. per curiam 710 F.2d 1302 (9th Cir. 1982)]; Golsen v. Commissioner,54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971) * * *. In the usual sale of property, if part or all of the purchase price is deferred, the obligation to pay the deferred amount represents genuine indebtedness and an investment in property. Even if such an obligation is secured only by the transferred property or other property and the buyer has no personal liability for its payment, the obligation *325 still represents genuine indebtedness and an investment in property. Mayerson v. Commissioner,supra at 351-352; see Crane v. Commissioner,331 U.S. 1 (1946). However, such conclusions do not follow when the principal amount of such nonrecourse indebtedness unreasonably exceeds the value of the security therefor because, under such circumstances, it is patent that the purchaser has no incentive to pay off the obligation. If the purchase price and the principal amount of the nonrecourse note unreasonably exceed the value of the property to be purchased, then no "genuine indebtedness exists." [6]Estate of Franklin v. Commissioner,544 F.2d 1045, 1048-1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Hager v. Commissioner,supra;Odend'hal v. Commissioner,80 T.C. 588, 604-605 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984). *326 Respondent contends that the $4,550,000 nonrecourse note Tri-Rotor gave to the DCD Group did not constitute genuine indebtedness and, therefore, the interest paid or accrued on the note is not deductible. Petitioner, of course, contends that the fair market value of the patents was at least as great as, if not greater than, the purchase price (and a fortiori the amount of the note), that the indewbtedness was genuine, and that the interest expenses were deductible. The record in the instant case makes it quite clear that there is no possibility that the note will be paid. The obligation was considered to have such little value that the original note could not be found. Casey termed the sale "contingent" and referred to the note as "speculative." He did not report his share of the note on his financial disclosure forms. Tri-Rotor and the DCD Group ignored the terms of the note, and when Tri-Rotor failed to meet payment obligations under the note, Paffendorf simply arranged to modify the agreement. The principal and interest payments due were continually deferred or postponed by a "moratorium." Further, it is clear that the patents had no commercial value in 1976. TAA's 1977 *327 valuation of the patents as worth $11,000,000 was without basis in fact. The valuation was premised on unrealistic assumptions and a disregard of realities. Conta, the only engine expert employed by TAA, performed only a minimal and cursory evaluation. He simply relied upon Doundoulakis' claims and performed no technical analysis. Heywood convincingly and articulately demonstrated that the patents lacked any commercial value. We conclude that the $4,550,000 nonrecourse note was not genuine indebtedness. [7] The amount of the note far exceeded the value of the patents. There was no realistic prospect that it would be paid. The claimed interest deductions in 1978 and 1979, therefore, are not allowable. [8]
*328 2. Research and Development
Tri-Rotor paid Hi-Tech for research and development with nonrecourse notes and then deducted the interest due upon the notes. As previously discussed, this indebtedness must be genuine for the interest expense to be deductible. See Estate of Franklin v. Commissioner,supra.
It is obvious that the notes were created only to increase deductions under section 174(a) and to generate further artificial deductions for interest expenses. There is no possibility that these notes will be paid, since Tri-Rotor never had and never will have any means of satisfying them. See Gibson Products Co. v. United States,637 F.2d 1041, 1047 (5th Cir. 1981); Graf v. Commissioner,80 T.C. 944, 951 (1983). Moreover, Hi-Tech placed no value upon the notes and did not include them in income. The original notes could not be found by Paffendorf or Doundoulakis, who, as the heads of COAP and Hi-Tech, were ultimately responsible for the custody and security of these supposedly valuable assets. Consequently, we have concluded that Paffendorf and company considered the notes to be valueless. We find that the *329 nonrecourse notes given to Hi-Tech were entirely lacking in economic reality and did not constitute genuine indebtedness. Therefore, the interest deductions claimed in 1978 and 1979 are not allowable. We have considered petitioner's other arguments and find them unpersuasive. B. Trade or Business Expenses
We now turn to the issue of the allowability of deductions taken by petitioners of the losses claimed by the Tri-Rotor partnership in 1978 and 1979. The losses claimed by the partnership are attributable to deductions for management fees, depreciation, research and development and miscellaneous items such as professional fees and marketing fees. To qualify the management fees and miscellaneous deductions, the expenses must have been paid or incurred in carrying on a "trade or business" within the meaning of section 162(a).[9] The depreciation deductions turn on, among other things, whether the patents were "used" in a "trade or business" or for "the production of income" within the meaning of section 167(a)(2). [10] Research and development expenses are deductible if paid or *330 incurred in connection with a "trade or business" within the meaning of section 174. [11] See Snow v. Commissioner,416 U.S. 500, 504 (1974). Thus, petitioners' right to these deductions depends upon a showing that the activities from which the deductions arose constituted a "trade or business." An activity does not constitute a trade or business unless it is engaged in with the predominant purpose and intention of making a profit. Flowers v. Commissioner,80 T.C. 914, 931 (1983); Siegel v. Commissioner,78 T.C. 659, 698 (1982). While a reasonable *331 expectation of profit is not required, the objective of making a profit must be bona fide. Dreicer v. Commissioner,78 T.C. 642, 643 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Allen v. Commissioner,72 T.C. 28, 33 (1979). The determination as to whether there was an actual objective of making a profit must be made at the partnership level. Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). We must, then, decide whether realizing a return on the investors' capital or providing the investors with tax benefits was the predominant objective of the partnership. Because a limited partnership acts only through general partners, we look to the actions of the general partners, Vanguard and Phoenix in this case, to determine whether the partnership had a profit objective. Wildman v. Commissioner,78 T.C. 943, 953-954 (1982); Siegel v. Commissioner,supra at 698-704. *332 Profit objective is a question of fact to be determined from all the facts and circumstances. Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Greater weight is placed upon objective facts than upon mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Churchman v. Commissioner,68 T.C. 696, 701 (1977). The burden of proof is upon the taxpayer. Surloff v. Commissioner,81 T.C. 210, 233 (1983); Rule 142(a).[12]
Some of the relevant factors to be considered in determining whether an activity is engaged in for profit are listed in section 1.183-2(b), Income Tax Regs.[13] In deciding whether the requisite profit *333 objective exists in any case, the presence of one, or even a majority, of these factors is not determinative. Benz v. Commissioner,63 T.C. 375 (1974); Golanty v. Commissioner,72 T.C. 411 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). *334 Petitioners contend that when Paffendorf purchased the patents on behalf of Tri-Rotor there was every indication that the engine would be a success, that Vanguard and Phoenix made every effort to make the engine a success, and that Tri-Rotor reasonably relied upon Hi-Tech to develop the engine in such a manner as to achieve maximum results. Respondent argues that tax profit, rather than economic profit, motivated Tri-Rotor's acquisition and holding of the patents. We agree. Paffendorf, the promotor and controlling shareholder of all the corporations involved, was clearly interested only in the creation of saleable tax advantages and the funneling of funds from the limited partners into entities controlled by him. Patent Acquisition
There is little evidence that Paffendorf's decision to acquire the patents for Tri-Rotor was based upon the types of consideration that normally would be expected to influence a sincere investor. [14] See Brannen v. Commissioner,supra at 471. Paffendorf obtained no independent analysis or expert appraisals of the engine prior to the purchase. He ignored the fact that every corporation and governmental agency contacted *335 by Casey and Doundoulakis had rejected the engine, criticized it technically, and disputed Doundoulakis' claims for the engine's performance. It is obvious that Paffendorf's most pressing concern, at the time the patents were acquired, was the passage of the Tax Reform Act of 1976 and the consequent need to structure a deal prior to 1977 in order to avoid limiting Tri-Rotor's deductions to amounts actually at risk. The terms of the patent assignment agreement were unrealistic and they were modified or ignored by Tri-Rotor at will. Lack of Arm's Length Dealing
The incestuous interrelationships of every entity involved with the engine led to a blatant lack of arm's length dealing in virtually every transaction. The confidential memoranda took note of these relationships warning that the "transactions may not be deemed to have been made at arm's length." Paffendorf controlled COAP and Hi-Tech with one hand, and ruled Vanguard, Phoenix, Pico, Greenhouse and all the limited partnerships, including Tri-Rotor, with the other. The members of the DCD Group and Paffendorf had been friends for many years. *336 Paffendorf's law firm, Sage, Gray, helped arrange for the work by TAA, and Jewett became a member of the advisory board of Greenhouse. Blau signed letters on behalf of Tri-Rotor and on behalf of Hi-Tech, illustrating the interdependence of all the entities involved. Given these relationships, we cannot believe that the transactions Tri-Rotor entered into with Pico, Vanguard, Phoenix and Hit-Tech had any objective other than generating funds for Paffendorf's corporations. None of these entities had experience with internal combustion engines and their development. The only "similar" activities carried on by Vanguard and Phoenix was the management of other limited partnerships. Grossly Inflated Purchase Price
A purchase price that is inflated by nonrecourse indebtedness raises serious questions about the motives of the acquiring party, since the presence of nonrecourse indebtedness creates the potential for "shenanigans." See Flowers v. Commissioner,supra at 937; Ramsay v. Commissioner,83 T.C. 793 (1984). The principals provided confused *337 and equivocal stories as to how the purchase price of $5 million was determined. Tri-Rotor only made $200,000 in payments, a de minimis amount compared with the depreciation and interest deductions claimed based upon the indebtedness. As we discussed previously, the note did not constitute genuine indebtedness. Paffendorf arranged with TAA for a meritless evaluation to be performed. The valuation was based upon unrealistic assumptions and the unsubstantiated claims produced by Doundoulakis. Conta, the only engine expert on the TAA panel, relied on the computer simulation, in which he had no confidence. The TAA valuation was not based on the realities of the situation and appears to have been produced with respondent in mind. The groundless gross overvaluation of the patents is convincing evidence that tax consequences were the paramount concern of all the participants. We found as a fact, supported by Heywood's persuasive evidence, [15] that the patents had no commercial value at the time they were purchased by Tri-Rotor. In buying the patents at an inflated price, Tri-Rotor was placed at a tremendous disadvantage, since to make a profit the engine patents had to generate revenues *338 far in excess of what they could feasibly produce. [16] Thus, the inflated indebtedness used to acquire the patents provides strong evidence that the activities of Tri-Rotor were not engaged in for profit but were entered into to reduce taxes by generating huge depreciation deductions attributable to an inflated basis. Research and Development
The lack of profit objective is further evidenced by the totally inefficient research and development effort. The R & D agreement is absurd on its face, with its impossible three phases in three years development scheme. As Heywood cogently pointed out, it was well known that a conventional engine would take more than three years and a novel engine even longer to develop. Even TAA disregarded the three year program in making its assessment. The plan to use nonrecourse notes to finance the research and development constituted an obvious attempt to artifically increase Tri-Rotor's section 174(a) deductions. These notes had *339 no value and Hi-Tech did not include them as income. Further, as best as can be determined from the poor records maintained by Hi-Tech and Tri-Rotor, Hi-Tech's expenditures approximately equaled the cash payments made by Tri-Rotor. Paffendorf's claim to have actually spent the $3 million on development required by the patent assignment agreement is self-serving and completely unsupported by the evidence. Petitioners failed to present any credible evidence to show that anyone with internal combustion expertise was ever employed in the engine's development by Hi-Tech. Doundoulakis [17] and Dominguez were certainly not engine experts. Doundoulakis had no qualifications for leading an engine development. His own research and development firm went bankrupt. Hi-Tech lacked the necessary experience, facilities and manpower to successfully develop a novel internal combustion engine. The 1980 TAA report and the Battelle report urged Tri-Rotor to obtain competent and experienced research and development assistance, underlining Hi-Tech's inadequacy and unsuitability. This advice was never followed. Thus, the profit objective in the instant case is further illustrated by the employment *340 of Hi-Tech as the developer of the engine. Unbusinesslike Conduct
The record contains ample other evidence that the patent activities were not engaged in for profit. The partnership was not operated in a businesslike manner. Vanguard and Phoenix never obtained fire or casualty insurance on the engine model. Their supervision of the development was minimal. No fixed budgets or goals were required or set with Hi-Tech. The market study was postponed indefinitely, and the "study" produced in 1984 by Doundoulakis and Dominguez, who were not marketing experts, was obviously prepared in contemplation of this litigation Vanguard and Phoenix never insisted that Doundoulakis fulfill his obligations by assigning the later patents to Tri-Rotor. Further, the "inspection reports" on the engine are incredible. Manber was not an expert on internal combustion engines, and *341 as a shareholder and director of Vanguard and the chairman of Greenhouse, he was not "independent." He did not draft the reports he signed. Since the engine development never progressed out of Phase I, it appears that these reports were created to add verisimilitude to the development effort, present a facade of compliance with the R & D agreement and to create the false impression that real progress had occurred. Vanguard and Phoenix never directed Hi-Tech to follow any of the recommendations received from TAA or Battelle. This disregard of advice from their own experts is a clear indication that the only concern was tax deductions, not engine development. In addition, the communications sent to the limited partners repeatedly stress the tax advantages of participation in Tri-Rotor and offer other "tax advantaged" investments. Profitability
Particularly noteworthy is the fact that no profits have been realized by Tri-Rotor nor is there any credible indication in the record that such profits are ever likely to occur. Instead Tri-Rotor has a history of losses, which in the aggregate exceed $5.5 million for the years 1976 through 1980. This record of large losses over *342 so many years is certainly persuasive evidence that none of the parties involved in the patent activities intended to produce a profit therefrom. See Brannen v. Commissioner,supra at 512. Conclusion
Based on the entire record, we find that petitioners have not shown that the predominant purpose or objective of Vanguard and Phoenix, as general partners, was to make a profit on behalf of Tri-Rotor. In reaching this conclusion, we have taken into full account the risks of loss inherent in the research and development of patents, but the deductions and credits which we here disallow are totally uncorrelated to the Congressional purposes underlying section 174. We are convinced, however, that the general partner's predominant, primary and principal objective was to make money for Paffendorf and to garner tax benefits for the limited partners. Specious nonrecourse notes were employed with a reckless abandon, and the relevant transactions were entered into and carried out with a complete indifference to and objective for profit. The use of nonrecouse transactions, arranged to artificially inflate basis and deductions without underlying economic substance *343 or entreprenurial risk, is unacceptable. As limited partners of such an arrangement, petitioners' are not entitled to deduct the partnership losses claimed by them. We have considered petitioners other arguments and find them unpersuasive. Based on the foregoing, Decisions will be entered for the respondent.
Footnotes
1. Petitioner Julia O'Brien is a party to this action only by virtue of having filed joint returns in 1978 and 1979 which her husband petitioner Dennis O'Brien. Therefore, "petitioner O'Brien" in the singular form hereinafter refers to petitioner Dennis O'Brien.↩
2. Respondent also disallowed certain interest deductions claimed by petitioners. Since petitioners failed to raise these deductions as an issue, either at trial or an brief, we assume that they have been conceded. ↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. Respondent has raised a number of other issues as grounds for denying all or a part of the claimed deductions, including that petitioners failed to substantiate some of the alleged expenditures claimed as deductions; that certain fees were capital in nature; and that the nonrecourse notes may not be included in basis for depreciation purposes. We find it unnecessary to consider these arguments.↩
5. These included problems with the valves, spark plug placement, piston sealing and the hold and release mechanism.↩
6. In Brannen v. Commissioner,78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984), this Court stated that the test was whether the stated purchase price unreasonably exceeded the value of the property, whereas in Hager v. Commissioner,76 T.C. 759, 774-775 (1981), this Court stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of the property. We need not decide that issue here because both the purchase price and the principal amount of the nonrecourse note far exceeded the value of the patents. See Fuchs v. Commissioner,83 T.C. 79↩ (1984).
7. Petitioner argues that even if the note was not a valid debt, under section 483, a portion of each payment to the DCD Group should be allocated to interest. Sales or exchanges of patents are specifically excluded from section 483. See sec. 483(d)(4); 1235(a). ↩
8. We have found it unnecessary to deal with respondent's arguments that, because the nonnegotiable note was not genuine indebtedness, it may not be taken into account in computing petitioner's basis for depreciation purposes under sec. 167. Nonetheless, we observe that the reasoning of the cases cited in the text on this issue supports respondent's argument. See particularly Hager v. Commissioner,76 T.C. 759, 773-774 (1981); Odend'hal v. Commissioner,80 T.C. 588, 604-605 (1983), affd. on this issue 748 F.2d 908↩ (4th Cir, 1984), and cases cited.
9. SEC. 162. TRADE OR BUSINESS EXPENSES (a) In General.- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
10. Section 1.167(a)-3, Income Tax Regs.↩, provides that intangibles with known limited useful lives, such as patents, may be the subject of a depreciation allowance.
11. See Lahr v. Commissioner,T.C. Memo. 1984-472↩.
12. Petitioners argue on brief, for the first time, that the burden of proof is upon respondent, alleging that the "for profit" issue was not raised by the notice of deficiency. Petitioners' assertion is meritless, being both groundless and untimely. The burden of proof in this case rests squarely on petitioners.↩
13. Sec. 1.183-2. Activity not engaged in for profit defined. (b) Relevant factors. In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors (whether or not listed in this paragraph) indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa. Among the factors which should normally be taken into account are the following: (1) Manner in which the taxpayer carried on the activity. * * * (2) The expertise of the taxpayer or his advisors. * * * (3) The time and effort expended by the taxpayer in carrying on the activity. * * * (4) Expectation that assets used in activity may appreciate in value. * * * (5) The success of the taxpayer in carrying on other similar or dissimilar activities. * * * (6) The taxpayer's history of income or losses with respect to the activity. * * * (7) The amount of occasional profits, if any, which are earned. * * * (8) the financial status of the taxpayer. * * * (9) Elements of personal pleasure or recreation.↩
14. See also Snyder v. Commissioner,T.C. Memo. 1985-9↩.
15. Heywood's evidence was clear and concise. The depth and breath of his expertise was apparent throughout his testimony and reports.↩
16. See Lahr v. Commissioner,T.C. Memo. 1984-472↩.
17. The section 1.183-2(b)(9), Income Tax Regs↩; factor relating to elements of personal pleasure is not usually a consideration in this type of tax shelter litigation. However, in the instant case, we note that Doundoulakis' work on the engine appeared similar to a pleasurable hobby.